UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| MICHELE MALVERTY, Individually and as successor in interest for JAMES C. RENNICK SR.<br><br>            Plaintiffs,<br><br>      vs.<br><br>EQUIFAX INFORMATION SERVICES LLC,<br><br>            Defendant. | Case No.:  8:17-cv-01617-JDW-AEP |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT, EVAN HENDRICKS**

## I.   <u>INTRODUCTION</u>

Evan Hendricks is one of the foremost experts on the Fair Credit Reporting Act (FCRA). He has been recognized as an expert in the credit reporting industry by the FTC, Congress, and by Equifax. For the reasons set forth below, the Court should deny Defendant's Motion to Exclude the Testimony of Plaintiff's Expert, Evan Hendricks.

Mr. Hendricks' testimony is necessary to help the jury to understand the policies and procedures of credit reporting agencies, which is kept confidential from the public and lay jurors. As other courts have noted, Mr. Hendricks' testimony will place Plaintiff's experience within the context of the prevalence of credit reporting inaccuracies, Equifax's policy and procedure failure, and repeated notice to Equifax that it was not complying with the FCRA.

## II.   <u>ARGUMENT</u>

### A.   <u>Legal Standard</u>

1

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed. 2d 469 (1993), the U.S. Supreme Court expounded on the requirements of Rule 702, establishing that the court must function as a "'gatekeeper'" to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. *Lanard Toys v. Toys "r" Us-Delaware,* 2019 U.S. Dist. LEXIS 46911, *17 (M.D. Fl. 2019). To fulfill its obligation under *Daubert*, a trial court engages in a three-part inquiry and considers:

> whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005). *Daubert* was followed by *General Electric Co. v. Joiner,* which held that a district court may exclude expert testimony when there are gaps between the evidence relied on by an expert. 522 U.S. 136 (1997). Finally, a year later, in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) the U.S. Supreme Court clarified that "the *Daubert* gatekeeping obligation applies not only to 'scientific' testimony, but to all expert testimony" and insures the reliability and relevancy of the expert testimony whether the expert is "basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 138, 152.

Thus, under *Daubert,* there are three discrete inquiries: qualifications, relevance, and reliability and the party offering such testimony has the burden of establishing these factors. *See Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir.2003); *Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1306 (11th Cir. 1999). To streamline

2

the analysis, following the *Daubert* cases, Federal Rule of Evidence 702 was amended to incorporate these elements:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.
>
> FRCP 702 (2011).

As detailed below, consideration of Hendricks' qualifications, reliability and helpfulness under these factors weigh heavily in favor of including his testimony pursuant to FRE 702.

B. <u>Mr. Hendricks Is Qualified To Testify On Damages</u>

Mr. Hendricks' is qualified to testify on damages regarding FCRA matters. Equifax makes numerous arguments why Mr. Hendricks should be excluded from doing so. Equifax begins by citing cases outside the 11th Circuit that have limited or excluded Mr. Hendricks' testimony on this issue. Equifax next argues that Mr. Hendricks testimony should be limited as he lacks qualifications relevant to discussing damages. Equifax then argues Mr. Hendricks is no more qualified than a layperson to determine what factors could, and how they could, contribute to damages. None of these arguments disqualify Mr. Hendricks' testimony.

The 11th Circuit has found Mr. Hendricks' is qualified to testify on FCRA damages. In *Ma v. Equifax Info. Servs., LLC,* 288 F. Supp. 3d 1360 (N.D. Ga. 2017), an FCRA case arose from a mixed-credit file and Equifax's failure to fix the file after it was brought to their attention. As in the instant matter, Equifax argued Mr. Hendricks' lacks qualifications relevant to discussing damages, and the jury could make these determinations themselves. *See Ma v. Equifax Info. Servs., LLC,* 288 F. Supp. 3d 1360, 1366 (N.D. Ga. 2017).

The court disagreed. "The Court finds that Plaintiff is qualified to talk about damages typically suffered by victims of credit reporting inaccuracies. His knowledge and experience may help the jury contextualize and make sense of complicated information." *Id. See Also Williams v. First Advantage LNS Screening Sols. Inc.*, 2015 U.S. Dist. LEXIS 174590 (N.D. Fla. Mar. 31, 2015) at *12 ("Mr. Hendricks, however, can testify as to ordinary, industry-standard consequences that flow from inaccurate consumer reporting to the extent he possesses such knowledge."); *Barnett v. JP Morgan Chase Bank*, 2014 U.S. Dist. LEXIS 5579 (N.D. Ala. Jan. 16, 2014) at *13 ("Mr. Hendricks is hereby permitted to offer opinions on the following objective topics relating to Ms. Barnett's claimed damages, including: (1) the chilling effects of anticipated credit problems which might prevent the consumer from applying for credit in the future because a lender in one way or another will ask about delinquencies and foreclosures and because there are penalties for not answering those questions truthfully, (2) debt collection efforts, such as, calls and letters, and (3) expended time and energy to correct errors not of one's making.")

Defendant's argument that Mr. Hendricks lacks qualifications to assess damages is nonsensical; he is not assessing whether Plaintiff has incurred damages or opining on the nature of specific damages. Mr. Hendricks states: "To be clear, I want to emphasize that most, if not all, of the testimony regarding Plaintiff's damage categories will come from fact witnesses."[1] Further, insofar as Mr. Hendricks discusses damage categories, he explains he is recounting damages typical in matters he has worked on or studied similar to those alleged by Plaintiff.[2] Mr. Hendricks is testifying to ordinary, industry-standard consequences flowing from inaccurate consumer reporting in a field the 11th Circuit found Mr. Hendricks to be an expert repeatedly.

---

[1] *See* Exhibit A, Expert Report and Curriculum Vitae of Evan Hendricks, p. 12
[2] *See Id.*

Furthermore, opposed to Defendant's assertion, Mr. Hendricks is not telling a jury what they could determine themselves; he is not making a determination, stating: "[i]f the jury concludes from the fact testimony that Defendant caused Plaintiffs to experience emotional distress, mental anguish, and/or frustration, then my expert testimony on typical damages could very well help them determine that such non-economic damages were or should have been foreseeable to Defendant."[3] Insofar as a lay jurist would consider the myriad forms of damages that Mr. Hendricks has observed in 30-plus years of reviewing and testifying in volumes of FCRA cases similar in to the Plaintiffs,[4] this is not grounds for disallowing Mr. Hendricks' testimony on the matter. As Mr. Hendricks' knowledge and experience could help the jury contextualize and make sense of the complicated matters at issue, the 11th Circuit has solidly upheld Mr. Hendricks' testimony in this area.

For these reasons, and all the reasons laid out by the courts in *Ma, Williams*, and *Barnett,* this Court should allow Mr. Hendricks to testify on common damages in FCRA cases.

      C.  <u>Mr. Hendricks' Is Qualified To Testify Concerning Equifax's State of Mind</u>

Equifax's attack on Mr. Hendricks' opinion regarding Equifax's "state of mind" is a veiled attack on his qualifications to testify in this matter in general. Mr. Hendricks' specialized experience and knowledge makes him one of the foremost experts on CRAs; he has studied the industry for over 30 years, publishing and editing the *Privacy Times* newsletter.[5]

---

[3] *Id.*

[4] *Id.* at p. 32; Professional Activities; 1992-Present; "Qualified by the federal courts in FCRA cases and cases involving credit reporting, credit scoring, privacy, and identity theft. (Complete list attached). I have read extensive deposition testimony by credit bureau and credit grantor personnel."

[5] *Id.;* Professional Activities; 1981-December 2013; Editor/Publisher of *Privacy Times*; "From 1981 to December 2013, I was Editor/Publisher of *Privacy Times*, a bi-weekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have research, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA."

5

Mr. Hendricks authored the authoritative book on CRAs: *Credit Scores and Credit Reports: How The System Really Works, What You Can Do [3rd Edition] (Privacy Times, 2007).*[6] Mr. Hendricks' book contains chapters addressing issues in this case, including mixed files; failures of CRAs to correct errors; and references to depostions of Equifax employees in trials where he gave testimony.[7] The book has 403 pages; describes how credit scoring systems work; and how to obtain reports, read and understand them, correct errors in them, and enforce their rights.[8] Mr. Hendricks also co-authored "Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society (2nd Edition, Southern Illinois University Press, 1990), which has a chapter on credit reporting.[9]

The credit reporting industry maintains tight control over the operations of the industry, and outsiders are simply not allowed access to their operations.[10] As such, Mr. Hendricks knowledge and understanding is unique. Through Mr. Hendricks' role as an expert witness in dozens of CRA cases, he has reviewed countless deposition transcripts from employees of CRAs.[11] He has examined thousands of pages of the agencies' internal documents. Access to this volume of information is impossible for anyone other than CRA employees. This information is not available to the public because CRAs do not discuss or publish information on their procedures and practices for handling personal data; in fact, CRAs typically consider such procedures to be proprietary and/or trade secrets.[12] It is impossible for a lay-jurist to acquire Mr. Hendricks' expertise and "draw inferences regarding Equifax's policies just as competently and effectively as Mr. Hendricks", as Equifax well knows how zealously it guards this information.

---

[6] *Id.* at 33.
[7] *Id.* at 6-7.
[8] *Id.* at 30.
[9] *Id.*
[10] *Id.* at 30-31
[11] *Id.* at 32.
[12] *Id.* at 30

6

Mr. Hendricks' has acquired knowledge of the operations of all three of the national CRAs, inclduing Equifax. Even top management of each agency lack his breadth of knowledge as CRAs compete and do not share information on policies and procedures. Mr. Hendricks' is able to compare procedures of CRAs and learn how each conform to FCRA mandates to protect consumer privacy, assure accuracy and properly respond to consumer disputes. Moreover, he has gained experience and expertise working with the SSA, the FTC, and Congress on the FCRA.[13]

Finally, Equifax itself recognized Mr. Hendricks as an expert on privacy issues. In its 1990 publication "The Equifax Report on Consumers in the Information Age," Equifax listed Mr. Hendricks as a privacy expert and expressed appreciation for his advice in that report.[14] That Equifax would now, after an additional twenty-nine (29) years of research, study and testimony in the field of credit reporting since they proclaimed Mr. Hendricks, state that h "has no insight into Equifax's decision-making, much less its state of mind" is simply not persuasive.

The court in *Ma v. Equifax Info. Servs., LLC,* 288 F. Supp. 3d 1360, at 1367 (N.D. Ga. 2017), addressed whether Hendricks' was qualified to opine on Equifax's "state of mind", and Equifax made identical arguments to exclude him from testifying their as it does here; that the testimony is speculative, that he lacks expertise on Equifax's beliefs as he has not worked for them, and that the jury is just as capable of making such a determination as Hendricks is. *See Id.*

The court disagreed with Equifax. "[U]nderstanding the inner workings of the credit reporting industry may require some specialized knowledge. And Mr. Hendricks's unique and specialized knowledge regarding credit reporting agency practices may help the jury contextualize and make sense of complicated information." *Id.* Regarding "state of mind", the court found exclusion "generally proper", but allowed Mr. Hendricks's testimony in this area to

---

[13] *Id.*
[14] *Id.* at 31.

7

illuminate what information would mean to a CRA. *See Id.* Finding Mr. Hendricks qualified to provide this more objective testimony, the Court allowed him to opine on it. *See Id.*

In *Williams v. First Advantage LNS Screening Sols. Inc.*, 2015 U.S. Dist. LEXIS 174590 at *9-10 (N.D. Fla. Mar. 31, 2015), the court stated that "Mr. Hendricks conveyed prevailing industry norms that do utilize additional identifiers based on his extensive experience with the industry. This type of information is useful to the jury because it allows them to infer from such widespread practice that industry players believe increasing the number of individual identifiers strengthens the accuracy of the consumer reports. It provides, as this Court has already explained, a benchmark by which the jury can assess whether Defendant's methods are reasonable." "At trial, Mr. Hendricks may testify on whether Defendant's procedures match industry standards if he dissects the basis for his knowledge of industry standards, explains how he applied his experience to the facts and how such application yields his opinion." *Id.* at *11.

In *Barnett v. JP Morgan Chase Bank*, 2014 U.S. Dist. LEXIS 5579 at *9-10 (N.D. Ala. Jan. 16, 2014), the court found that "Mr. Hendricks's substantial experience in the fields of consumer information generally and credit reporting more specifically renders him qualified to testify about Chase's noncompliance with its loan servicing and credit reporting practices and procedures, including his years of accumulated internal data regarding [defendant], the way [defendant] maintains, uses, and discloses information, how that relates to credit reporting on a consumer, and how that impacts on the credit reputation of consumers, like [plaintiff]." "Relatedly, the court determines that Mr. Hendricks is qualified to testify about industry practices, *including how credit reporting agencies function* and how they respond to disputes and complaints by consumers." *Id.* at *10. (*emphasis added*).

Equifax cites two matters dealing with substantially similar factual issues in FCRA

8

matters against Equifax to support invalidating Mr. Hendricks' testimony: *Valenzuela v. Equifax Info. Servs. LLC,* 2015 U.S. Dist. LEXIS 151064 at *8-9 (D. Ariz. Nov. 6, 2015) and *Anderson v. Equifax Info. Servs.,* 2018 U.S. Dist. LEXIS 52939 at *13-14 (D. Kan. Mar. 29, 2018).

   While Defendant is correct that both the courts in *Valenzuela* and *Anderson* rejected Mr. Hendricks' testimony on state of mind, Equifax attempts to paint an overly-broad picture of those portions of the rulings, inferring that those courts found the "jury can draw inferences from evidence regarding Equifax's policies just as competently and effectively as Mr. Hendricks." That was not what those cases held. In *Valenzuela*, the court ruled that "Hendricks is qualified to testify about Equifax's inner workings and opine on the reasonableness of its credit reporting policies and procedures." "Indeed, a layperson is not likely to have independent knowledge of the intricacies of a partial matching algorithm, the role it plays in developing a credit report, and the reasonableness of the Automated Consumer Dispute Verification Exchange ("ACDV"). Hendricks' specialized knowledge on these topics will assist the trier of fact." *Id.  Anderson* found "Hendricks is qualified to testify about [Equifax's] policies within the context of policies of other CRA and the credit reporting industry." "Through his experience, he has gained detailed knowledge of FCRA standards, indicia of mixed files, and CRAs' reinvestigation procedures. A layperson is likely not to have this detailed knowledge, and the Court finds that Hendricks's testimony regarding the nature of credit reports, FCRA standards, mixed files, and [Equifax's] "inner workings" would be helpful to the trier of fact in understanding both credit industry standards and Defendant's policies and procedures regarding mixed files." *Id.*

   Concerning the remaining portions of Hendrick's report which were stricken in *Valenzuela* and *Anderson*, Plaintiff submits that the court should follow *Barnett,* U.S. Dist. LEXIS 5579 at *9-10, and *Williams,* 2015 U.S. Dist. LEXIS 174590 at *9-10, which held that

Mr. Hendrick's testimony is exactly the type of information that would be useful to a jury.

Mr. Hendricks qualified to opine on Equifax's state of mind along with its policies and procedures, and this Court should concur with *Ma*, *Williams, Barnett* and allow his testimony.

      D.  <u>Mr. Hendricks Does Not Testify On Legal Opinions and Conclusions</u>

Fed. R. Evid. 704 provides "[a]n opinion is not objectionable just because it embraces an ultimate issue." Defendant alleges Mr. Hendricks opines Equifax did not comply with the FCRA, as he states: "Equifax's procedures were not adequate for assuring accuracy", and he does not discuss Equifax procedures. On the contrary, Mr. Hendricks testifies based on knowledge of Equifax's procedures from the deposition testimony of Equifax employees over decades, a fact noted by the Courts, Congress and regulatory agencies as stated at length above.

Mr. Hendricks is placing Ms. Malverty's experience with Equifax within the context of historical notice to Equifax of deficient policies and procedures. None of the sections identified by Equifax seek to supplant the jury's decision on liability. While Equifax states that Mr. Hendricks does not point to specific failures in Equifax's procedures, in fact Hendricks demonstrates deficiencies in Equifax's policies and procedures at length, specifically regarding the instant matter; opining on Equifax's reliance on 8-of-9 SSN matching; first name match; and geographic similarity due to an erroneously reported address in the instant matter, the three factors that lead Equifax to erroneously mix Mr. Rennick and Mr. Palmer's files.[15] Hendricks also goes into thorough detail as to particular deficiencies regarding Equifax's handling of Plaintiff's deceased notation and inadequate handling of Plaintiff's disputes.[16]

---

[15] *Id.* at 4.
[16] *Id.* at 10.

Mr. Hendricks discusses the general failures of Equifax's procedures and policies, citing the deposition testimony of Equifax employees explaining the "partial matching system".[17] Hendricks discusses how the employees testified to Equifax's use of 13 elements to file match, how few of these elements need to line up for files to be matched, and how the mixed file failure in the instant matter is consistent with failures in similar cases involving Equifax's partial matching system, from the present day stretching back decades.[18] Hendricks uses Equifax's own employees' words and his study of cases involving Equifax to thoroughly explain their model and approach. <u>Mr. Hendricks does not give a legal opinion</u>; he explains via his expertise and knowledge of the history of the field how the outcomes similar to the one in the instant matter could arise, and leaves the ultimate conclusion to the fact finder.

The *Ma* court addressed the issue of legal opinions. While *Ma* states the general principle is testifying experts cannot give legal opinions, the court narrowed the issue: "all witnesses are prohibited from testifying as to questions of law regarding the interpretation of a statute, the meaning of terms in a statute, or the legality of conduct." *Ma v. Equifax Info. Servs., LLC,* 288 F. Supp. 3d 1360, at 1367 (N.D. Ga. 2017) (*citing Dahlgren v. Muldrow,* 2008 U.S. Dist. LEXIS 4103 (N.D. Fla. Jan. 18, 2008)) (internal quotations omitted). *Ma* found "Here, Mr. Hendricks seeks to testify that Defendant did not have adequate procedures to ensure accuracy, and that Defendant was reckless in not taking steps to prevent mixing after Plaintiff gave notice of inaccuracies. Such testimony seeks to resolve a factual dispute, but does not go so far as to say that Defendant violated the FCRA. Therefore, Mr. Hendricks's opinions are permissible." *Id.*

As in *Ma*, Mr. Hendricks does not say Equifax violated the FCRA in the instant matter and Defendant cites no statements from Mr. Hendricks' supporting this claim. They cite no

---

[17] *Id.* at 6-8.
[18] *Id.*

11

testimony from Hendricks regarding questions of law, interpretation of the FCRA, or any legal opinions or conclusions. As Defendant in the instant matter cannot cite Mr. Hendricks' giving a legal statement, Equifax attempts to paint Mr. Hendricks' testimony as "*phrased in broad language*, containing legal conclusions in which he opines that Equifax did not comply with provisions of the FCRA." (*emphasis added*).

*Ma* addressed this exact complaint from Equifax about Mr. Hendricks' testimony, stating unequivocally that an expert does not invade the court's authority by discoursing *broadly* over the entire range of applicable law. *See Id.* (citing *Camacho v. Nationwide Mut. Ins. Co.,* 13 F. Supp. 3d 1343, 1366 (N.D. Ga. 2014). (*emphasis added*) "Here, Mr. Hendricks seeks to testify that Defendant did not have adequate procedures to ensure accuracy, and that Defendant was reckless in not taking steps to prevent mixing after Plaintiff gave notice of inaccuracies. Such testimony seeks to resolve a factual dispute, but does not go so far as to say that Defendant violated the FCRA. Therefore, Mr. Hendricks's opinions are permissible." *Id.*

Like *Ma,* Mr. Hendricks testimony in the instant matter explains Equifax did not have adequate procedures to ensure accuracy; Plaintiff did not take appropriate steps to avoid mixing of Rennick's and Palmer's files; and Defendant failed to take appropriate steps to prevent mixing even after notice was given to Equifax. As in *Ma,* and based on the principles of *Dahlgren* and *Camacho,* this Court should allow Mr. Hendricks testimony on these issues as Equifax has inaccurately painted Mr. Hendricks' permissible fact testimony as legal opinions or conclusions.

Equifax requests this court follow opinions excluding Mr. Hendricks' testimony regarding legal discussion. Equifax cites three (3) out-of-district cases in support of this statement, and in this instance only *Anderson v. Equifax Info. Servs., LLC,* 2018 U.S. Dist.

LEXIS 52939 at *14-16 (D. Kan. Mar. 29, 2018) is actually a factually similar FCRA case.[19]

While *Anderson* did limit Mr. Hendricks' testimony where it determined "his conclusions

regarding the reasonableness of Defendant's procedures articulates a legal conclusion drawn by

applying the law to the facts", the court allowed Hendricks to reference the FCRA and industry

standards in testifying about the credit reporting industry, Defendant's conduct, and perceived

issues with Defendant's processes and procedures. *Id* at *15. This is what Hendricks will testify

to in our case. Once more, Equifax has shaded the opinion of the court to appear far broader than

it actually is.

Accordingly, the court should not exclude Mr. Hendricks from opining over the broad

range of applicable law in this matter.

### E.   Mr. Hendricks Should Not Be Prevented From Testifying On Prior Cases

Mr. Hendricks' testimony about judgments in prior cases is relevant and should be

admitted in this case. Courts have repeatedly found that Equifax has failed to comply with its

duties under the Fair Credit Reporting Act, placing Equifax on notice that its policies and

procedures are inadequate to comply with the FCRA.

Moreover, Equifax has historically argued at trial that errors in the plaintiffs' credit

reports were caused by human error, and that the problems experienced by the plaintiffs have

been prevented from happening in the future. The jury may rightly conclude that the procedure

was to ignore written procedures. Mr. Hendricks' testimony about his work in other cases will

rebut Equifax's anticipated argument that this case represents a rare and isolated instance of

---

[19] *Zabriskie v. Fannie Mae*, 2016 U.S. Dist. LEXIS 90122 (D. Ariz. Apr. 22, 2016) dealt with the procedures of Fannie Mae, not a credit reporting agency. In fact, the 9th Circuit subsequently determined the FCRA did not apply. *See Zabriskie v. Fannie Mae*, 912 F.3d 1192, 1200 (9th Cir. 2019). In *McDonough v. JPMorgan Chase Bank, N.A,* 2016 U.S. Dist. LEXIS 126755 at *1-2 (E.D. Mo. Sep. 16, 2016) the matter dealt with the procedures of a credit lendor, and not a credit reporting agency.

error. Defendant has argued that Mr. Hendricks' discussion of prior cases should be excluded if intended to argue that past errors support finding of error in the instant matter; that five (5) cases should be excluded as they dealt with identity theft in FCRA cases as opposed to mixed file FCRA cases; that two (2) other District courts outside the Eleventh Circuit did not allow Mr. Hendricks' to testify on prior cases; and that the evidence is more prejudicial than probative.

District Courts have allowed Mr. Hendricks' testimony on prior cases for similar reasons. In *Miller v. Equifax Info. Servs., LLC,* 2014 U.S. Dist. LEXIS 69450 (D. Or. May 20, 2014), "Miller alleged Equifax negligently violated FCRA by (1) failing to follow reasonable procedures to assure the maximum possible accuracy of the information contained in her credit report; (2) failing to conduct a reasonable reinvestigation of disputed information contained in her credit report; (3) failing to disclose to Miller the entire contents of her credit file upon her request; and (4) furnishing Miller's consumer credit report to persons or businesses who did not have a permissible purpose to receive her credit report." *Id.* at *1-2. "During the three-day jury trial beginning July 24, 2013, it was undisputed that Equifax merged Miller's credit file with the file of a different person with the same name and a similar social security number as Miller but who lived in a different state and who had a negative credit record and significantly different credit record than Miller had." *Id.* at *2-3.

"When Miller learned about the erroneous merger of her file, she reported the problem to Equifax and began a two-year saga to resolve it. Despite Miller's repeated notices to Equifax and Equifax's numerous reports to Miller that it had investigated her complaints, Equifax did not correct the problem." *Id.* "In fact, Equifax did not take steps to correct the information in Miller's file until she filed this action after her two years of efforts proved fruitless. Nevertheless, Equifax argued to the jury that taking corrective steps only after a civil action is filed complied with its

14

"policy."" *Id.* "During the two years that Miller attempted to get Equifax to fix her file, she was frustrated, overwhelmed, angry, depressed, humiliated, fearful about misuse of her identity, and concerned that her reputation would be damaged as a result of Equifax's conduct." *Id.* The facts and allegations made against Equifax in the *Miller* matter are nearly identical to those of the instant matter.

"According to Margaret Leslie, Vice President of Equifax's Technology Area, this kind of file merger was a "reasonable combination" that occurs with "regularity"" *Id.* at *3. The court allowed the testimony of Mr. Hendricks "about other mixed-file cases in which juries had found Equifax had violated the FCRA", along with another expert in the same field. *Id.* at *4. *See also Kirkpatrick v. Equifax Information Services*, Case No: 3:02-cv-01197-MO (D. Or. Jan. 20, 2015) [ECF 206].[20]

That certain past litigation that Mr. Hendricks addresses concern matters of identity theft in FCRA cases as opposed to mixed file cases is of no matter to the relevance and admissibility of those cases in Mr. Hendricks' testimony. The court in *Drew v. Equifax Info. Servs., LLC*, 2010 U.S. Dist. LEXIS 131643 (N.D. Cal. Dec. 3, 2010) dealt with this issue. Drew was a cancer survivor and victim of identity theft. *See Id.* "In addition to tracking down the identity thief and moving to a new hospital for a new treatment, plaintiff contacted the banks that had issued the credit cards in his name and the credit reporting agencies that reported the fraudulent accounts and incorrect address as belonging to plaintiff." *Id.* at *5. "Plaintiff alleged that defendant Equifax, one of the credit reporting agencies, willfully violated the [FCRA]." *Id.* "Plaintiff argued that [Equifax] failed properly to reinvestigate and thereafter accurately report the status of

---

[20] *Id.* at p. 16. ("[W]hat I'm allowing and the reason I'm allowing it is testimony that puts the particular actions of [Equifax] in context…when he can by virtue of his study and his prior testimony, both in court and to Congress, make comparisons, that is something that is helpful to the jury." (January 18, 2005; Transcript available upon request)).

the disputed Bank of America card and disputed Seattle address in the manner required by the FCRA, and failed to maintain reasonable procedures to do so."

"[Drew's] expert witness, Evan Hendricks, testified not only as to the unreasonableness of defendant's reinvestigation procedures, but also as to the foreseeability of the problems that arose in this case." *Id.* at *6. Equifax argued against admission of portions of Hendricks' testimony, as it dealt with consent decrees. *See Id.* at *17. "[Equifax] argues that the documents are irrelevant, since they relate to mixed files and not identify theft, and because they predate any serious problems with identity theft." *Id.* "[H]owever, Mr. Hendricks's testimony explained why mixed files and identity theft present problems that are similarly difficult to resolve for a credit reporting agency." *Id.* That testimony explained "that [Equifax] faces the same general problems with reinvestigating mixed files and identity theft because in both instances the reporting banks are confused about identity." *Id.* at *16. The logic of Mr. Hendricks' explanation as to the similarity between the issues posed to CRAs by identity theft and mixed-files is just as applicable here as the court in *Drew* found it to be, and Equifax's argument to the contrary should be dismissed.

In the instant matter, Mr. Hendricks' explicitly states in the opening to his section on prior litigation that "it is intended to address the issues of notice to Equifax in its routine practices and procedures and the foreseeability of the fact that Equifax would continue inflicting damage on innocent consumers like Plaintiff."[21] Evidence of the routine practices and procedures of Equifax over the past thirty years up to the present, as recounted in the case history presented by Mr. Hendricks, have probative value exceeding any prejudice that Defendant's claim they would suffer from their inclusion. The reality is that Equifax's conduct has been found negligent

---

[21] *Id.* at p. 16.

16

and willful in the past, and the jury should be allowed to hear this information given its informational value. Knowledge of prior conduct, and Equifax's continued failure to reasonably conduct itself, is important to the fact-finder's conclusion whether Equifax's conduct was negligent and willful.

Equifax again relies on *Valenzuela* and *Anderson* insisting that Hendricks' be prevented from testifying on prior cases in FCRA matters. However, the Middle District of Florida has ruled in favor of allowing Mr. Hendricks' to testify on a defendant's failure to follow its policies in FCRA cases. In *Barnett v. JP Morgan Chase Bank*, 2014 U.S. Dist. LEXIS 5579 at *11 (N.D. Ala. Jan. 16, 2014), this Court addressed the defendant seeking "to prohibit Mr. Hendricks from testifying about [defendant's] alleged mistreatment of other borrowers in other cases." This Court allowed Mr. Hendricks' testimony in that matter "to offer opinions about [defendant's] noncompliance with its own policies and procedures in its handling of loans by other borrowers, including in particular its handling of [plaintiff's] loan." *Id*. In the instant matter, the testimony offered on prior litigation is being offered not to argue that past errors support error here, but that Equifax's policies and conduct are and have been inadequate for decades and remain so to this day. The 10th Circuit has also allowed for admission of previous conduct to prove that defendant was on notice and aware of its own detrimental conduct; to rebut the claim that acts were accidental; and because admission of such evidence is probative on the issue of whether the specific incident is an isolated mistake (as Equifax will undoubtedly attempt to argue in the instant matter) or part of a series of incidents which illustrate outrageous conduct. *See Bradbury v. Phillips Petroleum Co.,* 815 F.2d 1356, 1363-64 (10th Cir. 1987). For these reasons, Hendrick's testimony should not be excluded.

17

In the alternative, Plaintiff contends this Court should follow the logic of the Court of *Ma v. Equifax Info. Servs., LLC,* 288 F. Supp. 3d 1360, 1368 (N.D. Ga. 2017). *Ma* determined that "Because there is a factual dispute over the relevancy of [prior cases and consent decrees], a ruling on this issue is deferred until the records is more fully developed at trial. *Id*. (*citing Am. K-9 Detection Servs. v. Rutherford Int'l, Inc.,* 2016 U.S. Dist. LEXIS 62279 at *3 (M.D. Fla. May 16, 2016) ("Unless evidence [is clearly inadmissible on all potential grounds] . . . evidentiary rulings should be deferred until trial so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context."); *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.,* 2001 U.S. Dist. LEXIS 7213 at *1 (M.D. Ala. Feb. 20, 2001) ("It is the better practice to wait until trial to rule on objections when admissibility substantially depends upon what facts may be developed there.")).  If this Court is not fully persuaded that the relevance of prior cases and acts of Equifax outweigh the potential of prejudice, evidentiary rulings should be postponed until the trial so that the ruling be conducted once the record is more fully developed, as the court did in *Ma.*

For these reasons, this Court should allow the testimony of Mr. Hendricks regarding prior relevant cases.

F. <u>Mr. Hendricks' Should Not Be Precluded From Testifying On Consent Decrees and "Operation Busy Signal"</u>

Equifax seeks to exclude testimony that Equifax has been on notice of systemic problems within inaccurate credit reports, and specifically merging of consumer reports since the 1990s. Mr. Hendricks notes that as early as 1992, Equifax was on notice of the problem of mixed files and merged reports, by virtue of the state attorneys general actions and the FTC action. This context is relevant to plaintiff's claim that Equifax willfully disregarded her rights under the FCRA.

Mr. Hendricks has repeatedly been permitted to testify regarding this notice, in this district and others. The Court in *Indich v. Equifax Info. Servs.,* 2017 U.S. Dist. LEXIS 178909 (D. Colo. Oct. 30, 2017), fn. 2, stated "The Court recommends overruling Defendant's relevance objection to Hendricks' testimony concerning Federal Trade Commission complaints and consent decrees from the early-to-mid 1990's; such testimony simply provides background to the FCRA and to the operations and (possibly) policies of credit reporting agencies."

Likewise, in *Drew v. Equifax Info. Servs., LLC,* 2010 U.S. Dist. LEXIS 131643 at *15 (N.D. Cal. Dec. 3, 2010), the court stated that "[Mr.] Hendricks' testified regarding the reasonableness of [Equifax's] reinvestigation procedures." "Moreover, Mr. Hendricks' testified that [Equifax] long ago acknowledged these problems when it entered into agreements with the FTC and several states about reinvestigation of mixed files." *Id.* Equifax objected "to the admissibility of the FTC and state Agreement of Assurances documents, and to Mr. Hendricks' testimony regarding them." *Id.* at *17. The court disagreed with Equifax and allowed the consent decrees to be admitted, stating that "the documents are, in fact, relevant to the question of foreseeability and thus the question of willfulness." *Id.*

*Valenzuela* and *Anderson*, are both cited by Equifax to encourage the Court to preclude Mr. Hendricks' testimony on these decrees and "Operation Busy Signal". Both of these cases deal with the agreements and "Operation Busy Signal" in their analysis of prior litigation, and disallow them from Mr. Hendricks testimony for the same reasons. Plaintiff in the instant matter again urges the Court to follow the logic of *Barnett v. JP Morgan Chase Bank*, 2014 U.S. Dist. LEXIS 5579 at *11 (N.D. Ala. Jan. 16, 2014) in its analysis, which allowed Mr. Hendricks' testimony as "[t]his type of expert evidence is relevant" to Plaintiff's claims.

19

Alternatively, Plaintiff offers this Court should do as the court did *in Ma v. Equifax Info. Servs., LLC,* 288 F. Supp. 3d 1360, 1368 (N.D. Ga. 2017), and as outlined above in the prior litigation section, and defer a ruling on the issue of consent decrees and other prior probative acts of Plaintiff until the records is more fully developed at trial.

The history of Equifax's repeated violations of the FCRA due to the failure of their policies, practices and procedures are given considerable weight by the inclusion of the history of Equifax's failures; history that includes their failure to comply with consent decrees and intentional abuse of consumers in Operation Busy Signal.

For all the reasons set forth above, this Court should admit Mr. Hendricks' testimony regarding Consent Decrees and Operation Busy Signal.

### III.   <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff respectfully requests the Court deny Defendant's Motion to Exclude the Testimony of Plaintiff's Expert, Evan Hendricks.


DATED: April 12, 2019.                     Respectfully submitted,

                                           BY: /s/ Daniel Zemel
                                           Daniel Zemel (*Pro Hac Vice*)
                                           Elizabeth Apostola (*Pro Hac Vice*)
                                           Zemel Law LLC
                                           Attorney for Plaintiff