UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**MICHELE MALVERTY, individually, and**
as successor-in-interest of JAMES C.
RENNICK, Sr.,

    **Plaintiff,**

v.                                                         Case No: 8:17-CV-1617-T-27AAS

**EQUIFAX INFORMATION SERVICES,**
LLC,

    **Defendant.**
_____/

## ORDER

**BEFORE THE COURT** are Defendant Equifax Information Services, LLC's Partial Motion to Dismiss (Dkt. 85), Plaintiff Malverty's response (Dkt. 97), Plaintiff's Motion Seeking Leave to Amend Complaint (Dkt. 99) and Defendant's response (Dkt. 102). Upon consideration, Defendant's partial motion to dismiss is **GRANTED**. Plaintiff's motion to amend is **DENIED**.

**I.**     **FACTUAL ALLEGATIONS**

Plaintiff Michele Malverty, on her own behalf and as successor-in-interest to the estate of her father, James C. Rennick, Sr., alleges that Equifax mixed Rennick's credit report with that of another individual, James Palmer, who had a similar social security number and was deceased. (Dkt. 84 ¶¶ 17, 25). As a result, Rennick's credit report inaccurately showed that he was deceased and owed a mortgage with a large balance and delinquent payments. (Id.). Due to these inaccuracies, Rennick was unable to obtain a home equity loan and a car loan. (Id. ¶¶ 15, 29).

At the time, Rennick had a heart condition, and his wife, Angela Rennick, had Stage IV lung, kidney, bone, and brain cancer. (Id. ¶¶ 9-10). These conditions limited the Rennicks' activities and

abilities, and they wanted to renovate their home to accommodate their health needs. (Id. ¶¶ 9-11). Rennick and Malverty approached a mortgage broker for a home equity loan to make the necessary repairs and provide funds to pay Mrs. Rennick's anticipated funeral expenses. (Id. ¶¶ 12-14). The broker, however, told Rennick he was unable to obtain the loan because his Equifax and Experian credit reports indicated he was deceased.[1] (Id. ¶¶ 14-15).

Though Malverty and Rennick provided Equifax a letter from the Social Security Administration to prove Rennick was alive, Equifax did not remove the deceased notation. (Id. ¶¶19-20). In response to a second dispute, Equifax temporarily removed the deceased notation. (Id. ¶ 21). In February 2017, Rennick again attempted to obtain a home equity loan, but was declined because his credit report erroneously showed that he owed a mortgage with a large balance and delinquent payments to M&T Bank. (Id. ¶ 22). Malverty and Rennick spent the next few months calling Equifax to remove the mortgage from the report, but were unsuccessful. (Id. ¶ 23).

On Rennick's behalf, M&T Bank called Equifax to inform it that Rennick did not have an M&T mortgage. (Id.¶ 25). The bank also provided Rennick a letter indicating that he did not have a mortgage and his file was being mixed with another customer's. (Id.). Rennick provided the letter to Equifax by fax at least four times. (Id.¶ 26). Universal Credit Services ("UCS"), another credit reporting agency, also received notice that Equifax was not reporting Rennick's credit report correctly and informed Equifax. (Id. ¶ 28). Equifax refused to investigate the disputes and continued to report the erroneous information on Rennick's credit report. (Id. ¶¶ 27-28).

In June 2017, Mrs. Rennick passed away. (Id. ¶ 33). Because they had been unable to obtain the loan, Malverty and Mr. Rennick could not pay for Mrs. Rennick's funeral expenses and had to cremate her. (Id. ¶ 34).

---

[1] Experian was initially a defendant in the case, but settled with Malverty in November 2018. (Dkt. 71).

In September 2017, Rennick purchased an automobile from a Kia dealership with a loan from the dealership. (Id. ¶ 29). Approximately two weeks later, the dealership informed Rennick that it could not complete the loan because Rennick's credit report indicated that he was deceased. (Id.). The dealership repossessed the car. (Id.)

During the pendency of this case, on May 1, 2018, Mr. Rennick passed away, and Malverty had to cremate him. (Id. ¶¶ 37-40). Malverty pursues Rennick's claims as successor-in-interest to his estate. She also brings her own claims because she cared for her father and assisted him with his disputes with Equifax. As Rennick's successor-in-interest, she seeks actual and punitive damages for violations of the Fair Credit Reporting Act (FCRA) (Count I). Malverty also brings state law claims on her own and on Rennick's behalf for intentional infliction of emotional distress (Count II), intrusion upon seclusion (Count III), negligence (Count IV), negligent infliction of emotional distress (Count V), defamation (Count VI), gross negligence (Count VII), and slander of credit (Count VIII).[2]

## II.   MOTION TO DISMISS

Equifax moves to dismiss Malverty's individual claims, contending that she fails to allege that there was any inaccurate information on her Equifax credit report, that she was never denied credit, and that she does not otherwise state a claim on her state law claims. (Dkt. 85). Equifax also moves to dismiss Counts II, III, & V and the claim for punitive damages under the FCRA, arguing that Rennick's claim for punitive damages does not survive his death.

---

[2] Equifax moves to dismiss Malverty's intrusion upon seclusion, defamation, and slander of credit claims (Counts III, VI & VIII). Malverty did not respond to or oppose those arguments. Malverty further states that she has voluntarily relinquished some of her claims, though she does not identify those claims. (Dkt. 97 at 20). And, in Malverty's Proposed Fourth Amended Complaint, she drops her individual claims for intrusion upon seclusion, defamation, and slander of credit. (Dkt. 99-1 at 13, 17, 19). This indicates that Malverty has voluntarily dismissed these claims. In any event, dismissal of the counts is appropriate because she fails to state a claim.

### A. Standard

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must "plead all facts establishing an entitlement to relief with more than 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.'" *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)).

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citation omitted). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has not shown that the pleader is entitled to relief. *Id.*

A complaint's factual allegations must be accepted as true for purposes of a motion to dismiss, but this tenet is "inapplicable to legal conclusions." *Id.* at 678. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. And all reasonable inferences must be drawn in the plaintiff's favor. *St. George v. Pinellas Cty.*, 285 F.3d 1334, 1337 (11th Cir. 2002).

### B. Discussion

#### 1. *Malverty's claims*

Equifax generally argues that Malverty's claims are merely derivative of Rennick's and that these claims are not authorized under the FCRA. (Dkt. 85 at 5). But Malverty does not bring an

FCRA claim on her own behalf. And this contention does not relate to her state law claims.

## Count II - Intentional Infliction of Emotional Distress

Equifax argues that its alleged conduct does not rise to the requisite level of outrageousness under Florida law. (Dkt. 85 at 5-8). Malverty disagrees, noting that Equifax "was made aware that Mrs. Rennick was dying of cancer and the Rennicks needed the money so that James Rennick could afford to bury his wife." (Dkt. 97 at 15). She contends that "[t]he burial of one's parent or spouse is of such a personal and permanent nature[] that knowingly and intentionally preventing someone from being able to bury their loved one[] must be considered extreme and outrageous." (Id.). Malverty adds that Equifax's failure to correct the report resulted in the repossession of Rennick's car. (Id. at 16).

A claim of intentional infliction of emotional distress under Florida law requires a plaintiff to prove: (1) The wrongdoer's conduct was intentional or reckless, that is, he intended his behavior and he knew or should have known that emotional distress would likely result; (2) the conduct was outrageous, that is, it went beyond all bounds of decency, and is regarded as odious and utterly intolerable in a civilized community; (3) the conduct caused emotional distress; and (4) the emotional distress was severe. *LeGrande v. Emmanuel*, 889 So. 2d 991, 994 (Fla. 3d DCA 2004) (citation omitted).

In evaluating whether conduct is outrageous, "the subjective response of the person who is the target of the actor's conduct does not control . . . Rather, the court must evaluate the conduct as objectively as is possible to determine whether it is atrocious, and utterly intolerable in a civilized community." *Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 595 (Fla. 2d DCA 2007) (citations and internal quotation marks omitted). "Whether conduct is outrageous enough to support a claim of intentional infliction of emotional distress is a question of law, not a question of fact." *Id.*

(citations omitted).

Malverty argues that Equifax was aware of the Rennicks' medical conditions and "stress and injury which was developing by [Equifax's] conduct," and that Equifax had "a clear position of authority over Mr. Rennick with the clear ability to [affect] the Rennicks." (Dkt. 97 at 17-18). She relies on *Steadman* and comments "e" and "f" to Section 46 of the Restatement (Second) of Torts. Comment "f" provides:

> f. The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know. It must be emphasized again, however, that major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough.

Comment "e" "explains that the unequal position of the parties in a relationship, where one asserts and has the power to affect the interests of the other, may also supply the heightened degree of outrageousness required for a claim of intentional infliction of emotional distress." *Steadman*, 968 So. 2d at 596 (citing Restatement (Second) of Torts, § 46 cmt. e.).

In *Steadman*, the plaintiff alleged that her employer's workers' compensation carrier and its employee delayed authorizing a double lung transplant after the Compensation Claims court ordered the insurance carrier to pay for it. *Steadman*, 968 So. 2d at 595. The plaintiff also alleged that, based on physician testimony, the defendants knew that she was not expected to survive through the year and that the defendants' actions were "predicated on the fact that [she] would die from her condition in a short time and the problem would go away." *Id.* The plaintiff contended that the defendants intentionally denied and delayed payment for treatment in an effort to hasten her demise, induce stress, and inflict emotional distress. *Id.* Relying on Restatement comments "e" and "f," the court

held that this conduct, together with the defendants' knowledge that the plaintiff was susceptible to emotional distress and their power to affect the plaintiff, was sufficiently outrageous for an intentional infliction of emotional distress claim. *Id.* at 595-96.

*Steadman* is distinguishable from this case. While Malverty alleges that Equifax was aware of Mrs. Rennick's failing health, Equifax was not in a position to directly impact her medical care, unlike the defendant in *Steadman*. And it is unreasonable to infer that Equifax would benefit from her hastened demise.[3] As comment "f" explains, "major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough."

In sum, Malverty's allegations fall short of the conduct found to be sufficiently outrageous in cases permitting intentional infliction of emotional distress claims. *See, e.g.*, *Nims v. Harrison*, 768 So. 2d 1198 (Fla. 1st DCA 2000) (allegations of threats to kill the plaintiff and rape her and all of her children); *Thomas v. Hosp. Bd. of Dir. of Lee Cty.*, 41 So. 3d 246, 256 (Fla. 2d DCA 2010) (hospital made false statements about decedent's cause of death and those statements led to the interruption of decedent's funeral and a second autopsy); *see also Williams v. Worldwide Flight Servs., Inc.*, 877 So. 2d 869, 870 (Fla. 3d DCA 2004) ("Liability . . . does not extend to mere insults, indignities, threats, or false accusations.").[4]

---

[3] Although Malverty suggests that Equifax knew Rennick intended to use the loan for his wife's burial expenses, this is not clearly pleaded in the complaint. (Dkt. 84 ¶ 23). This fact, in any event, does not change the analysis.

[4] Several federal district courts have declined to permit intentional infliction of emotional distress claims in the credit reporting or debt collection context. *See, e.g.*, *Mikesell v. FIA Card Servs., N.A.*, No. 2:12-CV-606-FTM-29, 2013 WL 5781241, at *3 (M.D. Fla. Oct. 25, 2013) (allegations that defendants, aware of plaintiff's emotionally weakened state, would imply that she was stupid and/or a liar and made repeated efforts to collect a debt even though plaintiff told them she was not liable); *Marchisio v. Carrington Mortg. Servs., LLC*, No. 12-CV-14264-DLG, 2012 WL 12897471, at *3 (S.D. Fla. Nov. 29, 2012) (allegation that defendant harassed and threatened plaintiffs to recover a debt no longer legitimately owed); *Liste v. Cedar Fin.*, No. 8:13-CV-3001-T-30AEP, 2014 WL 1092347, at *4-5 (M.D. Fla. Mar. 19, 2014) (allegations of phone calls for debt collection and the false reporting of debt).

Accepting the Third Amended Complaint's allegations as true, Equifax's conduct was not objectively outrageous as a matter of law. This claim will accordingly be dismissed.

### **Counts IV and VII - Negligence and Gross Negligence**

Equifax moves to dismiss Malverty's negligence and gross negligence claims, contending that it does not owe her an independent duty of care. (Dkt. 85 at 9). Malverty contends that she was in the foreseeable zone of danger and therefore Equifax owed a duty to act with reasonable care. (Dkt. 97 at 10-14).

The parties agree that whether Equifax owed Malverty a duty of care is a question of law. They likewise agree that Florida law recognizes four general sources from which a duty of care may arise: (1) legislative enactments or administration regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case. *Clay Elec. Co-op., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003) (citation omitted).

Malverty contends that Equifax's duty of care arises from judicial precedent and the general facts of this case. (Dkt. 97 at 10). Specifically, she observes that in Florida, "[t]he duty element of negligence focuses on whether the defendant's conduct foreseeably created a broader 'zone of risk' that poses a general threat of harm to others."[5] *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992). She further argues that Equifax breached that duty by not correcting Rennick's credit report and that the breach caused her physical injury.

Notwithstanding her argument, Malverty cites no authority to support her contention that an incorrect credit report foreseeably creates a threat of harm to a third party, who had not applied for credit, was not denied credit, and whose only interaction with a credit reporting agency was phone

---

[5] Malverty also relies in part on the "zone of danger" test to support her negligent infliction of emotional distress claim. (Dkt. 97 at 18-19).

calls and letters on behalf of her parents. *See Kafka v. Wachovia Bank, N.A.*, 218 F. App'x 960, 962 (11th Cir. 2007) ("Plaintiffs cite to no authority discussing breach of a duty owed to unknown persons in the commercial context—the context presented in the instant case—but instead rely only on authority involving alleged torts that resulted in physical harm. And, even in those cases cited by Plaintiffs, the courts have failed to conclude that a duty was owed to the unknown person."). And she does not direct the Court to any other source of a duty Equifax owed her. These claims will therefore be dismissed.

### Count V - Negligent Infliction of Emotional Distress

Equifax contends that Malverty's claim for negligent infliction of emotional distress fails because she does not sufficiently allege that she sustained a physical injury as a result of Equifax's conduct. Equifax is correct.

In Florida, "the prerequisites for recovery for negligent infliction of emotional distress differ depending on whether the plaintiff has or has not suffered a physical impact from an external force." *Willis v. Gami Golden Glades, LLC*, 967 So. 2d 846, 850 (Fla. 2007) (citation omitted). The Florida Supreme Court explains:

> If the plaintiff has suffered an impact, Florida courts permit recovery for emotional distress stemming from the incident during which the impact occurred, and not merely the impact itself. If, however, the plaintiff has not suffered an impact, the complained-of mental distress must be manifested by physical injury, the plaintiff must be involved in the incident by seeing, hearing, or arriving on the scene as the traumatizing event occurs, and the plaintiff must suffer the complained-of mental distress and accompanying physical impairment within a short time of the incident.

*Id.* at 850 (internal quotation marks and citations omitted).

The Third Amended Complaint does not allege that Malverty suffered an "impact." Rather, she argues that she suffered physical injury in the form of increased blood pressure, heart problems, sleeplessness, anxiety, and loss of appetite. (Dkt. 84 ¶¶ 46, 48). However, "allegation of mere

9

psychic trauma is not enough to sustain a claim for negligent infliction of emotional distress." *Kendron v. SCI Funeral Servs. of Fla., LLC*, 230 So. 3d 636, 638 (Fla. 5th DCA 2017); *see also Brown v. Cadillac Motor Car Div.*, 468 So. 2d 903, 904 (Fla. 1985) ("[T]here is no cause of action for psychological trauma alone when resulting from simple negligence."). And her contention that her increased blood pressure satisfies the requisite physical injury is not supported by case law. *See Ledford v. Delta Airlines, Inc.*, 658 F. Supp. 540, 542 (S.D. Fla. 1987) (finding only that a "[t]emporary elevation of blood pressure not leading to further complications is not a significant and discernible injury"); *Chatham v. Adcock*, 334 F. App'x 281 (11th Cir. 2009) (in the context of Eighth Amendment claim, plaintiff did not demonstrate fluctuating blood pressure constituted a physical injury); *see also Pipino v. Delta Air Lines, Inc.*, 196 F. Supp. 3d 1306, 1318 (S.D. Fla. 2016) ("[E]levated blood pressure is physical and arguably discernable, but it is neither significant nor an injury or illness.").[6]

Additionally, as with her negligence claim, Malverty cites no authority to support her argument that a zone of risk or danger theory applies in the credit reporting context. (Dkt. 84 ¶ 79). Indeed, the zone of danger typically requires that the plaintiff is "placed in *immediate* risk of *physical harm* by [defendant's negligent] conduct." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1338 (11th Cir. 2012) (citing *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 547-48 (1994)) (emphasis added). Similarly, her bystander theory fails because Equifax could not reasonably foresee any physical harm to her based on its conduct. *See Zell v. Meek*, 665 So. 2d 1048, 1052-54 (Fla. 1995); *Champion v. Gray*, 478 So. 2d 17, 19-20 (Fla. 1985). As a result, she fails to plead facts which, taken as true, state a plausible claim for negligent infliction of emotional distress.

---

[6] The allegation in Malverty's Proposed Fourth Amended Complaint of Malverty's hospitalization due to heart problems comes closer to satisfying the physical injury requirement. (Dkt. 99-1 ¶ 29). Her claim, however, would still fail on other grounds.

### 2. *Malverty's claims as successor-in-interest to the estate of Rennick*

### Count II - Intentional Infliction of Emotional Distress

As discussed, Equifax's conduct was not objectively outrageous. This claim will accordingly be dismissed.

### Count III - Intrusion Upon Seclusion

Equifax argues this claim should be dismissed because disseminating a credit report does not constitute an intrusion into a private quarter. (Dkt. 85 at 17). While Malverty labels this claim "intrusion upon seclusion," her response indicates that it is actually a claim for publication of private facts, a category of the invasion of privacy tort.[7] (Dkt. 97 at 8). Malverty contends that this claim "has to do with Florida invasion of privacy based on publication of private facts" because Equifax publicly disclosed Rennick's credit report information to third parties, including Palmer's wife. (Id.). That report allegedly included not only false information, but also Rennick's personal data, including his social security number. (Dkt. 99-1 ¶ 13).

This invasion of privacy claim fails under either theory. Indeed, Malverty cites no authority holding that disclosure of a credit report is an intrusion into a private quarter. *Cf. Celestine v. Capital One*, No. 17-20237-CIV, 2017 WL 2838185, at *3-4 (S.D. Fla. June 30, 2017) (finding no actionable intrusion in accessing a credit report); *Stasiak v Kingswood Co-op, Inc.*, No. 8:11-CV-1828-T-33MAP, 2012 WL 527537, at *3 (M.D. Fla. Feb. 17, 2012) (same).

Moreover, a claim for publication of private facts requires: "1) the publication, 2) of private facts, 3) that are offensive, and 4) are not of public concern." *Spilfogel v. Fox Broadcasting Co.*, 433

---

[7] "Florida recognizes three categories of privacy torts: (1) appropriation—the unauthorized use of a person's name or likeness to obtain some benefit; (2) intrusion—physically or electronically intruding into one's private quarters; [and](3) public disclosure of private facts—the dissemination of truthful private information which a reasonable person would find objectionable." *Oppenheim v. I.C. Sys., Inc.*, 695 F. Supp. 2d 1303, 1308 (M.D. Fla.), *aff'd*, 627 F.3d 833 (11th Cir. 2010) (citation and internal quotation marks omitted).

F. App'x. 724, 725 (11th Cir. 2011) (citation omitted). "[I]n measuring the unacceptable conduct upon which a claim is made," invasion of privacy claims "share certain similarities" with claims for intentional infliction of emotional distress. *Stoddard v. Wohlfahrt*, 573 So. 2d 1060, 1062-63 (Fla. 5th DCA 1991) (applying intentional infliction of emotional distress standard to determine offensiveness of conduct in invasion of privacy claim); *see also Heath v. Playboy Enterprises, Inc.*, 732 F. Supp. 1145, 1148 (S.D. Fla. 1990) (citing Florida law and the Restatement (Second) of Torts in finding that the matter published must be "highly offensive to a reasonable person").

There is nothing inherently offensive, much less "highly offensive," about an incorrect deceased notation or owing a mortgage, both of which were untrue. *See Tyne ex rel. Tyne v. Time Warner Entm't Co., L.P.*, 204 F. Supp. 2d 1338, 1344 (M.D. Fla. 2002), *aff'd*, 425 F.3d 1363 (11th Cir. 2005) (requiring that for publication of private facts claim the published facts are true). Malverty fails to cite any authority finding that inadvertent disclosure of identifying information to a limited number of individuals supports an invasion of privacy claim. *See Regions Bank v. Kaplan*, No. 8:12-CV-1837-T-17MAP, 2013 WL 1193831, at *21 (M.D. Fla. Mar. 22, 2013), *on reconsideration in part*, No. 8:14-CV-1837-T-17MAP, 2015 WL 1456697 (M.D. Fla. Mar. 30, 2015) (dismissing claim for disclosure of social security number because publication was not "to the public in general or to a large number of persons").[8] Accordingly, Malverty does not state a plausible invasion of privacy claim as to Rennick. This claim will therefore be dismissed.

## Count V - Negligent Infliction of Emotional Distress

As with Malverty's negligent infliction of emotional distress claim, Equifax contends that Malverty has not sufficiently alleged that Rennick suffered a physical injury as a result of Equifax's

---

[8] Courts in other districts have also found that a social security number is not a "private fact." *See, e.g., Feltman v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, No. 06 C 2379, 2008 WL 5211024, at *6 (N.D. Ill. Dec. 11, 2008).

conduct. (Dkt. 85 at 18-19). *See also Sylvester v. GE Capital Retail Bank*, No. 6:12-CV-341-ORL-31, 2012 WL 3522691 (M.D. Fla. Aug. 14, 2012) (dismissing negligent infliction of emotional distress claim in credit reporting context for absence of injury). She responds that Rennick "was left a broken man after his wife died without the realization of her final wishes and this sadness and guilt for being unable to fix these problems weighed heavily on him hastening his death." (Dkt. 97 at 19). She also points to Rennick's ultimate cremation against his wishes, noting "[i]t is difficult to imagine a more lasting physical injury than the burning of one's body." (Id.). And the Third Amended Complaint alleges that Equifax's conduct caused Rennick to "suffer[] complications to his health due to the worsening of his heart condition."[9] (Dkt. 84 ¶ 47).

Malverty's claims of Rennick's heart problems and a hastened demise are vague and speculative. *See Spann v. United States*, No. 11-CV-23178-KMM, 2012 WL 3776684, at *4 (S.D. Fla. Aug. 30, 2012) (noting skepticism that claims of, among other things, heart palpitations "would be sufficient as a matter of law"). What is more, the heart condition appears to have preceded the events concerning Equifax. (Dkt. 84 ¶ 10). *See also Gonzalez-Jimenez de Ruiz v. United States*, 231 F. Supp. 2d 1187, 1201-02 (M.D. Fla. 2002), *aff'd*, 378 F.3d 1229 (11th Cir. 2004) ("The Court is unable to conclude that the alleged exacerbation of a pre-existing medical condition, such as diabetes or asthma, is sufficient to establish a physical impact directly flowing from the conduct of the Defendant."). Malverty cites no authority supporting her claim that cremation constitutes an actionable injury, especially where Equifax did not play an active role in that decision.

Even if an aggravated heart condition satisfies the physical injury requirement, as discussed, Malverty does not cite any authority extending a "zone of danger" theory in the credit reporting

---

[9] In the Proposed Fourth Amended Complaint, Malverty states that because of Rennick's grief, his health rapidly declined and he "died of a broken heart." (Dkt. 99-1 ¶ 41). This allegation would not support a plausible claim.

context, and there was no immediate risk of physical harm to Rennick. This claim is dismissed.[10]

### 3. *Punitive damages under the FCRA*

In the FCRA count, Malverty alleges that "Equifax's conduct, action and inaction was willful and with malice, rendering it liable for actual and statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n." (Dkt. 84 ¶ 53). Equifax argues that this claim for punitive damages does not survive Rennick's death because the damages are penal in nature rather than remedial. (Dkt. 85 at 13). Malverty argues that Rennick's claim for punitive damages survives his death because the FCRA is remedial.

In the absence of an expression of contrary intent, the survival of a federal cause of action is a question of federal common law. *James v. Home Constr. Co. of Mobile, Inc.*, 621 F.2d 727, 729 (5th Cir. 1980). "It is well-settled that remedial actions survive the death of the plaintiff, while penal actions do not." *United States v. NEC Corp.*, 11 F.3d 136, 137 (11th Cir. 1993), *as amended* (Jan. 12, 1994) (citing *Schreiber v. Sharpless*, 110 U.S. 76, 80 (1884)).

"A remedial action is one that compensates an individual for specific harm suffered, while a penal action imposes damages upon the defendant for a general wrong to the public." *Id.* (citation omitted). This Circuit employs the widely accepted three-prong test to determine whether an action is remedial or penal: "(1) whether the purpose of the statute was to redress individual wrongs or more general wrongs to the public; (2) whether recovery under the statute runs to the harmed individual or to the public; and (3) whether the recovery authorized by the statute is wholly disproportionate to the harm suffered." *Mike Smith Pontiac, GMC, Inc. v. Mercedes-Benz of N. Am.,*

---

[10] Damages for emotional distress may nonetheless be available through the FCRA claim. *See Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1304 (11th Cir. 2019); *see also Levine v. World Fin. Network Nat. Bank*, 437 F.3d 1118, 1124-25 (11th Cir. 2006). It appears that the plaintiffs in *Marchisio* and *Levine* did not raise negligent infliction of emotional distress claims.

*Inc.*, 32 F.3d 528, 534 n.3 (11th Cir. 1994) (quoting *NEC Corp.*, 11 F.3d at 137).

The FCRA authorizes actual or statutory damages and "such amount of punitive damages as the court may allow" for willful violations.[11] 15 U.S.C. § 1681n(a)(2). Equifax acknowledges that the FCRA has penal and remedial characteristics:

> The statute protects individual consumer's rights and provides individuals with a cause of action to recover compensatory damages for either willful or negligent violations. *See* 15 U.S.C. §§ 1681n, 1681o. The FCRA, however, is also enforced by the Federal Trade Commission, the Consumer Financial Protection Bureau, the attorneys general of the fifty states, and a wide number of other governmental agencies. *See* 15 U.S.C. § 1681s.

(Dkt. 85 at 14). Equifax argues, however, that punitive damages are penal, as opposed to the remedial nature of the FCRA as a whole.

At least two district courts have held that an FCRA claim for punitive damages is penal and does not survive the death of a party. *Beaudry v. TeleCheck Servs., Inc.*, No. 3:07-0842, 2016 WL 11398115, at *16 (M.D. Tenn. Sept. 29, 2016); *Caraballo v. S. Stevedoring, Inc.*, 932 F. Supp. 1462, 1466 (S.D. Fla. 1996). And numerous courts have held that claims for punitive damages under other generally remedial statutes, like the Americans with Disabilities Act (ADA) and Age Discrimination in Employment Act (ADEA), abate upon the death of a party. *See, e.g.*, *Smith v. Dep't of Human Servs, State of Okla.*, 876 F.2d 832, 836-37 (10th Cir. 1989) (ADEA); *Kettner v. Compass Grp. USA, Inc.*, 570 F. Supp. 2d 1121, 1133-34 (D. Minn. 2008) (ADA and Rehabilitation Act); *Hanson v. Atl. Research Corp.*, No. 4:02CV00301 SMR, 2003 WL 430484, at *4 (E.D. Ark. Feb. 14, 2003) (ADA); *Hawes v. Johnson & Johnson*, 940 F. Supp. 697, 704 (D.N.J. 1996) (ADEA). I agree with the reasoning of these cases and find that, even if the FCRA is correctly characterized as a remedial statute, an FCRA claim for punitive damages is penal by nature and does not survive the death of

---

[11] A plaintiff may recover actual damages for negligent violations. 15 U.S.C. § 1681o.

a party. Malverty's claim for punitive damages is dismissed.

### III. MOTION TO AMEND

Malverty seeks leave to file a Fourth Amended Complaint in response to Equifax's arguments. (Dkt. 99). She states that "[t]he proposed Amended Complaint simply updates the factual pleadings to reflect the full extent of Ms. Malverty's injuries and the meeting of all elements of her claims" and that:

> Since the time of her last amendment in November 2018 . . . significant discovery has been exchanged and numerous depositions have been taken in this matter. Plaintiff did not initially believe that an amendment would be necessary regarding the factual information obtained through the depositions; however, recently Defendant has moved to dismiss Plaintiff's complaint on the basis that the complaint does not fully detail Ms. Malverty's physical and emotional injuries as a result of Equifax's actions. . . . This amendment could not have occurred earlier as depositions of parties and witnesses have been ongoing through the present.

(Id. at 5, 7).

Equifax argues the proposed amendment is unduly delayed, prejudicial, and futile.[12] Indeed, it seems that most of the proposed additional information should have been available to Malverty when she filed her Third Amended Complaint.[13] In any event, a review of the Proposed Fourth Amended Complaint demonstrates that the additional allegations do not save the claims that are subject to dismissal. Nor do the proposed allegations substantively add to the surviving claims.

---

[12] Leave to amend should be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2). "Although the decision whether to grant leave is within the discretion of the district court, the rule contemplates that leave shall be granted unless there is a substantial reason to deny it." *Halliburton & Assocs, Inc. v. Henderson, Few & Co.*, 774 F.2d 441, 443 (11th Cir. 1985). "[D]enial of leave to amend is justified by futility when the complaint as amended is still subject to dismissal." *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1263 (11th Cir. 2004) (citation and internal quotation marks omitted).

[13] The original complaint was filed on July 3, 2017. (Dkt. 1). Amended complaints were filed on July 7, 2017, November 27, 2017, and December 5, 2018. (Dkts. 5, 17, 84).

Accordingly, the proposed amendments are futile. The motion for leave to file a fourth amended complaint is due to be denied.

## CONCLUSION

Defendant Equifax Information Services, LLC's Partial Motion to Dismiss (Dkt. 85) is **GRANTED**, and Plaintiff Malverty's Motion Seeking Leave to Amend Complaint (Dkt. 99) is **DENIED**. Malverty's individual capacity claims in Counts II, III, IV, V, VI, VII, and VIII are **DISMISSED**; Malverty's claims as successor-in-interest of Rennick's estate in Counts II, III, and V are **DISMISSED**; and Count I's claim for punitive damages is **DISMISSED**. Defendant shall answer the Third Amended Complaint within fourteen (14) days.

**DONE AND ORDERED** this 11th day of September, 2019.

*/s/ James D. Whittemore*
**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record