UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MICHELE MALVERTY, as successor-in-interest of JAMES C. RENNICK, Sr.,

    Plaintiff,

v.                                        Case No: 8:17-CV-1617-T-27AEP

EQUIFAX INFORMATION SERVICES, LLC,

    Defendant.
_____/

## ORDER

**BEFORE THE COURT** are Defendant Equifax Information Services, LLC's Motion for Summary Judgment (Dkt. 112), and Plaintiff Michele Malverty's Opposition (Dkt. 122). Upon consideration, Defendant's motion is **GRANTED in part** and **DENIED in part**.

**I.    BACKGROUND AND UNDISPUTED FACTS**

Malverty is the daughter of James Rennick, Sr. and successor-in-interest to his estate (Dkt. 84 ¶ 5). Equifax is a consumer reporting agency (CRA) as defined by the Fair Credit Reporting Act (FCRA). (Dkt. 112-1 at 3). Equifax gathers information about consumers to prepare consumer reports and has maintained a credit file for Rennick since 1972. (Id.; Dkt. 112-2 at 5). In 2006, a mortgage lender mistakenly reported the social security number of another individual, James Palmer, in relation to Rennick's mortgage account. (Dkt. 112-2 at 5). The lender transferred the mortgage to another entity after updating Rennick's social security number in its reporting. (Id. at 6). Additionally, Rennick's address appeared on Palmer's credit file. (Id.). This overlapping information caused Equifax's system to combine the two files in November 2008, and accounts

1

for Rennick and Palmer appeared in a single file. (Id.)

Rennick became aware of the incorrect information in his Equifax credit file when he applied for a mortgage loan in January 2017. (Dkt. 84 ¶ 14; Dkt. 122-1). He applied to refinance a property his wife inherited from her cousin, John Selvaggio, although the title was in Selvaggio's name. (Dkt. 122-15). He submitted a loan application with a mortgage broker, Lightning Funding. (Dkt. 112-14). The broker pulled Rennick's Equifax consumer report, which included a WebBank account indicating he was deceased. (Id. at 47). Rennick was unable to obtain the loan. (Dkt. 122-5 at 5). The principal of Lightning Funding, Scott Fessler, testified that without the deceased notation, the application would have been approved. (Id.).

Rennick and Malverty contacted Equifax to dispute the deceased notation.[1] The first phone dispute documented in Equifax records was in April 2017. (Dkt. 112-1 at 6). Following that call, Equifax changed the name on the file from Palmer's to Rennick's, and removed the deceased code from the WebBank account's "ECOA" field, but did not remove the "consumer deceased" narrative or the WebBank account until October 19, 2017. (Dkt. 112-1 at 7, 15).

At some point, Rennick discovered that Equifax was also incorrectly reporting that he owed a mortgage to M&T Bank. (Dkt. 84 ¶ 22). Malverty called and mailed documents (including copies of Rennick's identification and social security cards) to Equifax to dispute the mortgage.[2] (Dkt. 112-1 ¶¶ 6-15). M&T Bank also notified Equifax of the error. (Dkt. 122-2 at 2).

In her declaration, Celestina Gobin, an employee of Equifax, avers that Equifax removed

---

[1] In her response to an interrogatory, Malverty identified at least eighteen attempts to contact Equifax. (Dkt. 112-3 at 4-5). And in her opposition to summary judgment, Malverty states that many of her "early interactions" with Equifax from January and February 2017 are not documented "due to changes in [her] phone and fax providers" and "calls made from landlines." (Dkt. 122 at 2 n.7). Equifax acknowledges eight calls and three mail disputes. (Dkt. 112-1 at 6-15). The dispute over the number and time frame of the calls does not affect the disposition of the motion.
[2] Equifax acknowledges that Malverty disputed the mortgage by phone in April 2017 (Dkt. 112-1 at 7), but in her opposition, Malverty argues she contacted Equifax about the mortgage "significantly earlier than Equifax claims." (Dkt. 122 at 2). She provides no record evidence to support this assertion.

the M&T mortgage in June 2017. (Dkt. 112-1 ¶ 86). She also avers that Equifax updated the social security number in Rennick's file in May 2017 (id. ¶ 82), but Palmer's number nonetheless appeared in Rennick's file from September through December 2017, (Dkt. 125-1 at 2; Dkt. 127-1 at 2).

In September 2017, Rennick attempted to finance the purchase of a car through a dealership. (Dkt. 112-18). Through CoreLogic Credco, LLC, the dealership received an Equifax report reflecting that Rennick was deceased and which included Palmer's name and social security number. (Dkt. 122-7 at 2). Capital One, N.A. was contacted about funding the loan and obtained Rennick's consumer reports from three CRAs. (Dkt. 122-8 at 1). Experian and Trans Union reported that Rennick's social security number began with 088, while Equifax reported the number began with 086. (Id. at 1-2). Because of the discrepancy, Capital One conditioned its counteroffer for the loan on verification of Rennick's social security number with a LexisNexis fraud report. (Id. at 2). The report reflected a "Potential High Risk/Deceased" designation. (Id. at 3). And Capital One did not fund the loan because of the designation. (Id.).[3] Three additional loan applications submitted by the dealership underwent the same review process and were denied. (Id. at 3-4). The dealership repossessed the car. (Dkt. 84 ¶ 29).

In June 2017, Mrs. Rennick passed away. (Id. ¶ 33). During the pendency of this case, Rennick passed away. (Id. ¶¶ 37-40). In June or July 2018, Equifax added a "Do Not Combine" notation in Rennick's file. (Dkt. 112-27 at 3).

*Pending Claims*

All of Malverty's individual claims and her claims as successor-in-interest to Rennick's

---

[3] Rennick sued LexisNexis for inaccurately reporting his information. (Dkt. 112-24). He settled those claims.

estate for intentional infliction of emotional distress (Count II), intrusion upon seclusion (Count III), and negligent infliction of emotional distress (Count V) have been dismissed. (Dkt. 135). Rennick's claim for punitive damages under the FCRA was also dismissed. This leaves Rennick's claims for actual and statutory damages under the FCRA (Count I), negligence (Count IV), defamation (Count VI), gross negligence (Count VII), slander of credit (Count VIII), and a claim for punitive damages under state law. (Dkt. 84). Equifax moves for summary judgment, contending the FCRA claims fail because Malverty cannot prove Equifax acted willfully or caused Rennick's damages and that the state law claims are preempted and unsupported by record evidence. (Dkt. 112 at 2-3).

## II. STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is material if it may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing, by reference to materials on file, that there are no genuine disputes of material fact. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the movant adequately supports its motion, the burden shifts to the nonmoving party to show specific facts that raise a genuine issue for trial. *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010). The evidence presented must be viewed in the light most favorable to the

nonmoving party. *Ross v. Jefferson Cty. Dep't of Health*, 701 F.3d 655, 658 (11th Cir. 2012). "Although all justifiable inferences are to be drawn in favor of the nonmoving party," *Baldwin Cty. v. Purcell*, 971 F.2d 1558, 1563-64 (11th Cir. 1992), "inferences based upon speculation are not reasonable," *Marshall v. City of Cape Coral*, 797 F.2d 1555, 1559 (11th Cir. 1986).

## III. DISCUSSION

In her Complaint, Malverty alleges that "Equifax negligently and willfully failed to maintain and/or follow reasonable procedures to assure maximum possible accuracy of the information it reported to one or more third parties pertaining to [Rennick], in violation of 15 U.S.C. § 1681e(b)," and that "Equifax negligently and willfully failed to investigate Rennick's dispute in violation of 15 U.S.C. § 1681i." (Dkt. 84 ¶¶ 50-51).

Section 1681e(b) of the FCRA provides that "[w]henever a [CRA] prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." Additionally, if the

> accuracy of any item of information contained in a consumer's file at a [CRA] is disputed by the consumer and the consumer notifies the agency directly . . . the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer.

§ 1681i(a)(1)(A). And the CRA shall "maintain reasonable procedures designed to prevent the reappearance in a consumer's file, and in consumer reports on the consumer, of information that is deleted . . . ." § 1681i(a)(5)(C).

Under § 1681e(b), a plaintiff must prove: "(1) inaccurate information was included in [his] report; (2) the inaccuracy was due to [the CRA's negligent or willful] failure to follow reasonable

procedures to assure maximum possible accuracy;[4] (3) [he] suffered [an] injury; and (4) [his] injury was caused by the inclusion of the inaccurate entry." *Smith v. E-Backgroundchecks.com, Inc.*, 81 F. Supp. 3d 1342, 1356-57 (N.D. Ga. 2015). A plaintiff bringing a claim under § 1681i(a) must prove: "(1) the [consumer report] contains inaccurate or incomplete information; (2) the [plaintiff] notified the [CRA] of the alleged inaccuracy; (3) the dispute is not frivolous or irrelevant; (4) the [CRA] failed to respond or conduct a reasonable reinvestigation of the disputed items; [and] (5) the failure to reinvestigate caused the [plaintiff] to suffer out-of-pocket losses or intangible damages such as humiliation or mental distress." *Lazarre v. JPMorgan Chase Bank, N.A.*, 780 F. Supp. 2d 1320, 1329 (S.D. Fla. 2011). Willful noncompliance can result in liability for actual or statutory damages and punitive damages. § 1681n. Negligent noncompliance results in liability for actual damages. § 1681o.

As to Malverty's §§ 1681e(b) and 1681i(a)(1)(A) claims, Equifax argues there is no record evidence of willful conduct and that she cannot establish causation between the inaccurate report and any harm, thereby precluding actual damages. Equifax contends that her state law claims are preempted by the FCRA, unsupported by record evidence, and do not warrant punitive damages.

1.   *Preemption*

Although the question of willfulness and causation under the FCRA is a jury question, the FCRA preempts Malverty's state law claims, precluding punitive damages. The parties agree that the FCRA preempts defamation, invasion of privacy, and negligence state law claims based on disclosed information, unless that information was false and "furnished with malice or willful

---

[4] In its motion, Equifax does not contend summary judgment is appropriate because its procedures to ensure accuracy and handle disputes were reasonable. The reasonableness of a CRA's procedures is typically a jury question. *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991) ("The agency can escape liability if it establishes that an inaccurate report was generated by following reasonable procedures, which will be a jury question in the overwhelming majority of cases.").

6

intent to injure" the consumer. § 1681h(e). The issue is whether Equifax acted with malice or willful intent to injure Rennick. (Dkt. 112 at 12; Dkt. 122 at 10-11).

As § 1681h(e) provides:

> [N]o consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency . . . except as to false information furnished with malice or willful intent to injure such consumer.

Interpreting this language, the Eleventh Circuit held that "where a company furnishes credit information about a consumer to a [CRA] pursuant to the [FCRA], the company furnishing the information is protected from state law defamation and invasion of privacy claims unless the information it provided was both false and also given with the malicious or willful intent to damage the consumer." *Lofton-Taylor v. Verizon Wireless*, 262 F. App'x 999, 1001-02 (11th Cir. 2008). Other courts have applied § 1681h(e) to disclosures of false information by a CRA. *See, e.g.*, *Parks v. Experian Credit Bureau*, No. 609-CV1284-ORL-19DAB, 2010 WL 457345, at *3 (M.D. Fla. Feb. 4, 2010); *see also Genevish v. Wells Fargo Bank, N.A.*, No. 8:13-cv-402-T-33AEP, 2013 WL 1296276, at *2 (M.D. Fla. Apr. 1, 2013) (collecting cases, including *Lofton-Taylor*, for the proposition that "the FCRA preempts state negligence and defamation claims absent allegations of malice"); *Young v. Equifax Credit Info. Servs., Inc.*, 294 F.3d 631, 638 (5th Cir. 2002) ("The FCRA preempts state law defamation or negligent reporting claims unless the plaintiff consumer proves 'malice or willful intent to injure' him.")

Here, there is no genuine dispute of material fact as to whether Equifax furnished false information with malice or willful intent to injure Rennick. At most, the evidence shows that Equifax's employees were reckless or negligent in their obligations to reasonably ensure the accuracy of, and investigate discrepancies in, Rennick's credit file. Indeed, most of the conduct

7

Malverty relies on in her opposition to summary judgment relates to Equifax's delay in acting, not affirmative, intentional conduct. (Dkt. 122 at 8-9, 11).[5]

There is no evidence, for example, that Equifax intentionally included the incorrect information in Rennick's file. Rather, it is undisputed that the merger of his and Palmer's information stemmed from a third party's reporting error. Likewise, there is no evidence that Equifax employees did not remove the deceased notation in Rennick's file or untangle his and Palmer's personal information for the purpose of injuring him. And Malverty does not contest that in response to the disputes, Equifax initially removed the deceased code from the "ECOA" field in Rennick's file and, at some point, removed the M&T account. Finally, even an isolated act of "chuckling" during a phone call or hanging up on the caller does not demonstrate malice or intent to injure.

In sum, because Malverty cannot show that Equifax acted with malice or intent to injure Rennick, her state law claims are preempted. This part of the motion is therefore due to be granted.[6]

---

[5] Among the conduct Malverty relies on is "Equifax's failure to correct the mistakes after being told the loan was needed to provide funeral arrangements for Mrs. Rennick." (Id. at 9). This statement is not supported by the cited evidence. In the cited portions of her deposition, Malverty testified that Rennick's failure to obtain a loan caused her mother to be cremated, not that she informed Equifax that Rennick sought the loan to pay funeral expenses. (Dkt. 122-10 at 4, 7, 11). In any event, this fact does not affect summary judgment.

[6] Accordingly, punitive damages under Florida law are unavailable. Even if the state law claims were not preempted, Malverty does not show that punitive damages are warranted under section 768.72 of the Florida Statutes. She cites no cases that have imposed state law punitive damages in the credit reporting context, and courts have rejected such claims. *E.g.*, *Seckinger v. Bank of Am., N.A.*, No. CV415-306, 2017 WL 360924 (S.D. Ga. Jan. 6, 2017), *report and recommendation adopted*, 2017 WL 354857 (S.D. Ga. Jan. 23, 2017) (rejecting punitive damages despite three disputes with CRA over nine-month period). Secondly, for punitive damages claims against corporations and other legal entities, section 768.72(3) imposes "specific and heightened rules," rather than "common law rules of agency and vicarious liability." *Coronado Condo. Ass'n, Inc. v. La Corte*, 103 So. 3d 239, 240-41 (Fla. 3d DCA 2012). Moreover, the record evidence closest to establishing punitive damages only implicates Equifax's employees, not the corporation or its officers, directors, or managers. There is no evidence that the act of "chuckling" during phone disputes and hanging up on a caller, or even ignoring disputes, is a company practice participated in or condoned by Equifax or its corporate management.

Lastly, she cannot show that Equifax acted intentionally or with gross negligence. Fla. Stat. § 768.72(2); *see, e.g.*, *Tiger Point Golf & Country Club v. Hipple*, 977 So. 2d 608, 610-11 (Fla. 1st DCA 2007) ("If . . . causing permanent injuries or fatalities by knowingly operating trucks with defective brakes does not merit punitive damages, then merely neglecting (albeit for several weeks) to repair an obviously defective handrail, which ultimately results in injury . . . does not evince the culpability required for punitive damages."); *cf. Johnson v. New Destiny Christian Ctr.*

8

## 2. *Actual Damages*

A CRA is liable for a consumer's actual damages caused by a willful or negligent violation of the FCRA. 15 U.S.C. §§ 1681n, 1681o. Additionally, "failure to produce evidence of damage resulting from a FCRA violation mandates summary judgment." *Nagle v. Experian Info. Sols., Inc.*, 297 F.3d 1305, 1307 (11th Cir. 2002) (citation omitted); *see also Riley v. Equifax Credit Info. Servs.*, 194 F. Supp. 2d 1239, 1244 (S.D. Ala. 2002) ("To make out a cause of action for actual damages, the damages must be attributable to the defendant.").

Equifax argues any damages relating to the denial of the home refinancing loan are speculative and therefore unrecoverable because (1) the Rennicks did not have insurable title to the property at the time of the application, which would have prevented them from securing the loan; and (2) Lightning Funding is a mortgage broker, not a lender, and the Rennicks never submitted a loan application to, or received an adverse action letter from, a lender. (Dkt. 112 at 15-17). Equifax also contends any damages caused by the denial of the car loan are not attributable to Equifax because LexisNexis provided the incorrect information to Capital One. (Id. at 19).

Equifax's contentions are without merit. Malverty has presented sufficient evidence relating to the home and car loans to create a genuine issue of material fact as to causation and actual damages. Summary judgment on this issue is therefore inappropriate.

### *Home Loan*

Malverty has demonstrated a genuine issue of material fact on the question of actual damages relating to the mortgage loan, even though the Rennicks did not have insurable title to the property and submitted their application through a mortgage broker, rather than a lender. She

---

*Church, Inc.*, 771 F. App'x 991, 995 (11th Cir. 2019) ("Given [section 768.72's] exacting standards, even for torts where liability also contains the elements of willfulness, a finding of liability for compensatory damages does not dictate an award of punitive damages." (brackets, modifications, and citations omitted)).

concedes that at the time of the loan application, her parents did not have insurable title in the property. She points out, however, that Selvaggio's will devised the property to Mrs. Rennick, and it is not uncommon for a borrower to perfect title "prior to the granting of the mortgage[,] usually on the day of settlement." (Dkt. 122-14 at 2).[7] The process can take between days and weeks. (Id.; Dkt. 122-18 at 12-13). And no expert witness in the case was aware of an instance where lack of insurable title prevented a property owner from obtaining a mortgage. (Dkt. 122-16 at 3; Dkt. 122-4; Dkt. 122-18 at 12-21; Dkt. 122-14 at 2).

Likewise, it is not fatal to Malverty's claim that Selvaggio' will was not self-proving. (Dkt. 122-15). One of the witnesses to the will could have testified before the probate court. (Dkt. 122-4 at 1-3). Even without that testimony, probate would still have been possible on the oath of the personal representative or an individual with no interest in the estate "stating that the person believes the writing exhibited to be the true last will of the decedent." Fla. Stat. § 733.201. And whether a lengthier probate process would attenuate the connection between Equifax's conduct and any actual damages is for the trier of fact to resolve.

As for the contention that Rennick never submitted an application to a lender that was denied, Equifax does not cite any authority supporting its contention that a lender's denial of credit is required for an FCRA claim. *See Robbins v. CitiMortgage, Inc.*, 16-CV-4732-LHK, 2017 WL 6513662, at *17 (N.D. Cal. Dec. 20, 2017) ("[N]o case has held that a denial of credit is a prerequisite to recovery under the FCRA."). And courts have held that a denied application through a broker is sufficient to establish damages. *See, e.g.*, *id.*; *Lambert v. Beneficial Mortg. Corp.*, 3:05-

---

[7] This statement comes from one of Malverty's expert witnesses, Stephen Flatow, whom Equifax challenges. (Dkt. 115). Equifax also moves to exclude the testimony of Phillip Baumann. (Dkt. 114). Neither challenge affects disposition of the motion.

cv-5468, 2007 WL 1309542, at *6-7 (W.D. Wash. May 4, 2007). The plaintiff in *Robbins*, for example, demonstrated she was harmed when a mortgage broker submitted her application, which included a false report of a foreclosure, on a desktop underwriter (DU) system and was denied. 2017 WL 6513662, at *18. The broker later declared that "[h]ad [the defendant] not reported any mention of a foreclosure, I would have been able to proceed with [the plaintiff's] refinance." *Id.* And, in denying summary judgment, the court in *Lambert* relied on a statement by a mortgage broker that the plaintiffs were unable to complete financing with an erroneous reporting of a balance and past due amount. 2007 WL 1309542, at *7.

Similarly, upon Rennick's application, the mortgage broker ran a DU Underwriting Findings Report and sent Rennick's credit information to lenders for approval. (Dkt. 122-5 at 3). According to Fessler, the report generates a result which, if approved, allows a consumer to obtain a loan without additional action. (Dkt. 122-6 at 1-2). And he testified that Rennick was not approved for a loan because of the incorrect information. (Dkt. 122-5 at 5).

The cases Equifax relies on are distinguishable. The plaintiff in *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469 (2d Cir. 1995), "refrained from applying for any new credit out of fear that he would be rejected." 56 F.3d at 472. And the plaintiff in *Riley v. Equifax Credit Info. Servs.*, 194 F. Supp. 2d 1239 (S.D. Ala. 2002), had "no evidence that he was denied credit based on [the CRA's report]." 194 F. Supp. 2d at 1244. There is record evidence that Rennick applied for the mortgage and was denied because of inaccuracies in his consumer report.

Equifax contends that the Rennicks' credit history casts doubt on whether they could have obtained a mortgage, even without the inaccurate information in Rennick's consumer report. (Dkt. 112 at 7). Equifax provides, for example, a judgment of mortgage foreclosure against the Rennicks,

apparently for defaulting on a loan.[8] (Dkt. 112-16 at 10-19). And credit information furnished by Universal Credit Services reflects payment delinquencies by the Rennicks. (Dkt. 112-17). Additionally, in correspondence between Fessler and a lender with whom he attempted to "manually underwrite the loan," the lender rejected the application based at least in part on accurate information about the Rennicks' creditworthiness. (Dkt. 112-26; Dkt. 122-6 at 2).[9]

This evidence seems to weaken causation between Rennick's inaccurate consumer report and the denial of the mortgage application, as this negative credit information could have decreased the likelihood of a successful mortgage application, especially when potential lenders expressed concerns about the information. Whether this is enough to preclude relief, however, is a question for the trier of fact. *See, e.g.*, *Philbin v. Trans Union Corp.*, 101 F.3d 957, 969 (3d Cir. 1996) (denying summary judgment where an inaccurate report could be a "substantial factor" in the denial, among other possible causes).

*Car Loan*

Malverty has also established a factual issue on actual damages relating to the repossessed car. Equifax argues that any damages are not attributable to it because LexisNexis provided the credit information used to evaluate Rennick's application for the car loan. (Dkt. 112 at 18). Malverty responds that Equifax provided the information with a deceased notation to LexisNexis and that Equifax's merger of Palmer's and Rennick's files triggered the LexisNexis fraud check. (Dkt. 122 at 16-18). While LexisNexis ultimately provided the incorrect information to Capital One, there is evidence that Equifax's merger of Rennick's and Palmer's files caused the inaccurate

---

[8] In their loan application with Lightning Funding, the Rennicks answered "No" to the question, "Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment?" (Dkt. 112-14 at 4).

[9] The lender stated, "No we cannot do this. There's 2x30 in the past 12 on the mortgage alone. The car payment history's are terrible as well." (Dkt. 112-26 at 4). The mortgage appears to refer to the incorrectly reported M&T account. (*See* Dkt. 112 at 17; Dkt. 122 at 15 n.90). Malverty does not dispute the other information.

12

reporting, which precludes summary judgment.

As discussed, LexisNexis purchases personal information from third parties like Equifax to prepare its fraud checks. (Dkt. 122-17 at 3). It also obtains information on deceased individuals from the Social Security Administration. (Id. at 4). Equifax provided LexisNexis with Rennick's and Palmer's social security numbers and addresses. (Id. at 4; *see also* Dkt. 112-23). At the time of Rennick's car loan application, Palmer appeared as deceased in the Social Security Administration files. (Dkt. 122-17 at 5). A LexisNexis representative testified that the fraud report it provided Capital One reflected that Rennick was deceased because of his association with Palmer's social security number. (Dkt. 112-28 at 3) ("There was information that we had where Mr. Rennick's social security number appears with Mr. Palmer's name and vice versa, Mr. Palmer's social security number appears with Mr. Rennick's name.").

Equifax argues it removed the deceased notation from Rennick's credit file after Malverty's initial dispute and did not report to LexisNexis that Rennick was deceased. (Dkt. 112-2 ¶¶ 37-38; Dkt. 112-25; Dkt. 112-27 at 3). But even if Equifax removed the deceased notation, there is evidence that the social security numbers were still combined in Rennick's Equifax file at the time of the car loan application. There is also evidence that this merger created a discrepancy between the social security numbers provided by Equifax and other CRAs, which triggered the fraud check, and that the merger potentially affected LexisNexis's determination that Rennick was deceased.

Finally, the nexus between the alleged FCRA violation and actual damages relating to the denied car loan is not so speculative as to warrant summary judgment. Malverty has presented a factual issue on actual damages for the jury.[10]

---

[10] Malverty also presents evidence of damages apart from out-of-pocket losses related to the home or car

### *3. Willfulness Under the FCRA*

A CRA may also be liable for punitive and statutory damages for a willful violation of the FCRA. 15 U.S.C. §1681n. Punitive damages under the FCRA are unavailable because the claim does not survive Rennick's death. (Dkt. 135 at 14). To the extent Equifax argues its conduct was not willful, thereby precluding statutory damages under the FCRA, willfulness is a question for the jury.

"[R]eckless disregard of a requirement of FCRA would qualify as a willful violation within the meaning of § 1681n(a)." *Collins v. Experian Info. Solus., Inc.*, 775 F.3d 1330, 1336 (11th Cir. 2015) (citations omitted). "[A] company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* (citations omitted).

Malverty presents evidence suggesting reckless disregard of at least the FCRA's requirements to reinvestigate and correct inaccuracies in consumer credit files. There is testimony that, in addition to waiting nearly a year into litigation to untangle Palmer's and Rennick's files, Equifax representatives "chuckled" during the dispute phone calls and hung up on the caller. (Dkt. 122-10 at 3; Dkt. 122-11 at 4). In response to the initial disputes, although Equifax removed the deceased code from the "ECOA" field in Rennick's file, it did not remove the "consumer deceased" narrative or WebBank account until much later. And the merger of Palmer's and

---

loan. (Dkt. 122-10 at 7-8); *see also Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1304 (11th Cir. 2019) (finding that to recover emotional distress damages, a plaintiff must prove a "causal connection between the [FCRA] violation and the emotional harm"); *Smith*, 81 F. Supp. 3d at 1365 (noting that plaintiff may recover actual damages for humiliation, mental distress or injury to reputation and creditworthiness); *Jordan v. Equifax Info. Servs., LLC*, 410 F. Supp. 2d 1349, 1356 (N.D. Ga. 2006) (collecting cases in finding "[a]ctual damages under the FCRA may include damages for humiliation or mental distress, even if the consumer has suffered no out-of-pocket losses").

Rennick's social security numbers continued into late 2017, despite Malverty's disputes. A jury could find that Equifax's response to the numerous disputes and its inaction amounts to reckless disregard. *See Williams v. First Advantage LNS Screening Sols., Inc.*, 238 F. Supp. 3d 1333, 1345 (N.D. Fla. 2017) (finding that consciously ignoring procedures "evinces willfulness"); *Barron v. Trans Union Corp.*, 82 F. Supp. 2d 1288, 1298-99 (M.D. Ala. 2000) (denying summary judgment on willfulness for incorrectly reporting social security number and ignoring dispute). This evidence is sufficient to create a factual issue for the jury. Summary judgment is inappropriate, and this part of the motion is therefore due to be denied.

## CONCLUSION

Defendant Equifax's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**. (Dkt. 112). Summary judgment on Malverty's state law claims, including for punitive damages, is granted in favor of Equifax. The FCRA claim (Count I) survives.

**DONE AND ORDERED** this 18th day of October, 2019.

*/s/ James D. Whittemore*
**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record